1  Christopher Sproul (State Bar No. 126398)
   Jodene Isaacs (State Bar No. 226895)
2  ENVIRONMENTAL ADVOCATES
   5135 Anza Street
3  San Francisco, California 94121
   Telephone: (415) 533-3376
4  Facsimile: (415) 358-5695
   Email: csproul@enviroadvocates.com
5  Email: jisaacs@enviroadvocates.com

6  Amy Chastain (State Bar No. 235745)
   BAYKEEPER
7  785 Market Street, Suite 850
   San Francisco, CA 94013
8  Telephone: (415) 856-0444 x106
   Facsimile: (415) 856-0443
9  Email: amy@baykeeper.org

10 Attorneys for Plaintiff
   BAYKEEPER

11

12                  UNITED STATES DISTRICT COURT FOR THE
13                    NORTHERN DISTRICT OF CALIFORNIA

14
15 BAYKEEPER, a non-profit corporation,          Civil No. C-07-01550 PJH

16                         Plaintiff,            [~~PROPOSED~~] ORDER DIMSISSING
                                                 COMPLAINT
17          v.

18 GRANITE ROCK COMPANY,

19                         Defendant.

20

21

After consideration of the Settlement Agreement between the parties attached to this order, I hereby dismiss this case with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2) and retain jurisdiction over the parties with respect to any disputes that may arise under the Settlement Agreement.

APPROVED AND SO ORDERED, this _26_ day of _February_ ____, 2008.



ATTACHMENT 1
Settlement Agreement with Exhibits

# SETTLEMENT AGREEMENT

WHEREAS, San Francisco Baykeeper ("Baykeeper") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of the San Francisco Bay and other area waters;

WHEREAS, Granite Rock Company ("Granite Rock") produces and recycles construction materials and has facilities located at 355 Blomquist Street, 365 Blomquist Street, and 195 Seaport Boulevard in Redwood City, California (the "Redwood City Facilities"), and a facility located at 11711 Berryessa Road, San Jose, California (the "San Jose Facility") (collectively the "Facilities" or "each Facility").

WHEREAS, Granite Rock has obtained coverage for storm water discharges from the facilities pursuant to the National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 97-03-DWQ, issued pursuant to Section 402 of the Federal Water Pollution Control Act, 33 U.S.C. §1342 (hereinafter "General Permit");

WHEREAS, on January 12, 2007, Baykeeper served Granite Rock, the United States Environmental Protection Agency, the State Water Resources Control Board, the San Francisco Regional Water Quality Control Board, the United States Attorney General and other individuals and entities with a notice of intent to file suit ("60-Day Notice") under Sections 505(a)(1) and (f) of the Federal Water Pollution Control Act ("Clean Water Act" or "the Act"), 33 U.S.C. § 1365(b)(1)(A), alleging violations of the Act and the General Permit at the Facilities;

1

WHEREAS, Baykeeper filed a complaint ("Complaint") against Granite Rock in the United States District Court, Northern District Court of California on March 19, 2007, Civil Docket No. 07-01550 PJH;

WHEREAS, Baykeeper contends in its 60-Day Notice and Complaint that Granite Rock has repeatedly discharged polluted storm water in violation of the Clean Water Act and discharged pollutants without NPDES permit authorization, but Granite Rock denies all allegations of the 60-Day Notice and Complaint, and contends that Baykeeper's Complaint should be dismissed; and

WHEREAS, the Parties agree that it is in their mutual interest to resolve this matter without further litigation by entering into this Settlement Agreement ("Agreement").

NOW THEREFORE, THE SETTLING PARTIES AGREE AS FOLLOWS:

## I. COMMITMENTS OF GRANITE ROCK

1. In order to continue reducing or preventing pollutants in storm water associated with industrial activity and to eliminate alleged potential unauthorized non-storm water discharges from each Facility into the waters of the United States, Granite Rock will implement appropriate Best Management Practices ("BMPs") as described in Paragraph 7 of this Agreement below.

2. <u>Designated Discharge Point:</u> Within thirty (30) calendar days of the Effective Date, to the extent not already implemented, Granite Rock shall identify on the Site Plan for each Facility every point at which storm water is discharged from the Facility. To the extent not already implemented, each Designated Discharge Point shall be numbered and clearly labeled on

2

each of the respective Site Maps for the Redwood City and San Jose Facilities, which Site Maps are included within each of the respective facility SWPPPs.

3. <u>Designation of Process Areas</u>: Within thirty (30) calendar days of the Effective Date of this Agreement, Granite Rock will identify the portions of the Facilities where industrial processes occur on each Facility Site Map. Granite Rock shall operate the Facilities such that processing activities that generate dust, fine particulate matter, or other materials that can be tracked or entrained in storm water discharging from the Facilities are principally conducted within process areas.

4. <u>Designation of Storage Areas</u>: Within thirty (30) calendar days of the Effective Date of this Agreement, Granite Rock shall identify the portions of the facilities where outdoor storage of sand, gravel, base rock, or concrete and asphalt rubble awaiting recycling occur at each Facility on each Facility Site Map.

5. <u>Dust Generating Activities</u>: Within thirty (30) calendar days of the Effective Date, Granite Rock shall ensure that the SWPPP for each Facility describes all industrial activities that generate dust or particulates that may be deposited within the Facility's boundaries and shall identify their discharge locations; the characteristics of dust and particulate pollutants; the approximate quantity of dust and particulate pollutants that may be deposited within the facility boundaries; and describe the primary areas of the facility where dust and particulate pollutants would settle.

6. <u>Designation of All Sampling Locations</u>: After the Effective Date, Granite Rock shall ensure that the SWPPP for each Facility fully describes the protocol for taking storm water

3

samples. The description shall be specific with respect to time and location of sampling, and shall further explain how the sample points are representative of off-site discharge. For instance, if the discharge point is a driveway, Granite Rock shall specify which side of the driveway the sample is collected from and determine if additional collection points need to be added on other portions of the driveway to ensure that the sampling program characterizes all the constituents in the Facility's storm water run off.

7. <u>Best Management Practices</u>. Granite Rock shall implement or continue implementing the following BMPs:

a. <u>Storm Drain Inlet/Catch Basin Inspection</u>: After the Effective Date and prior to October 1 thereafter, or otherwise within seven (7) calendar days of the first forecasted storm event likely to result in discharge, Granite Rock shall inspect all storm drain inlets at the Facilities. During these inspections, Granite Rock shall clean each drain inlet as needed, using a vacuum or other effective cleaning device/method in order to remove dusts and solids that have entered the storm drain inlets.

b. Except when impeded by rain and ponded water flowing to and/or through the storm water system, Granite Rock shall clean out sediments collected in the drain inlets at the Facilities between forecasted storm events likely to result in discharge from the Facilities.

c. In order to check that the drain inlets are not in a condition that would materially impair their efficacy, Granite Rock shall inspect all drain inlets at Facilities during the Wet Season on a monthly basis.

4

d. Granite Rock shall cover the drain inlets at the Facilities for the entirety of the summer months (June 1 to September 30) ("Dry Season") with a metal plate or some other solid material that will help prevent dust and solids from collecting in the drain inlets.

e. <u>Log of Storm Drain Inlet/Catch Basin Inspections, Maintenance and Cleaning</u>: After the Effective Date, Granite Rock shall keep a log of the monthly Storm Drain Inlet/Catch Basin inspections set forth in Paragraph 7(c) of this Agreement on a form like the log attached hereto as Exhibit A.

f. <u>Site Sweeping and Cleaning</u>: Within ten (10) calendar days of the Effective Date, Granite Rock shall implement the Site Sweeping and Cleaning Plan attached hereto as Exhibit B.

g. <u>Site Sweeping and Cleaning Log</u>: After the Effective Date, Granite Rock shall keep a log of the sweeping activity performed at each Facility on the form attached hereto as Exhibit C. Granite Rock shall make the records of sweeping at each facility covered by this Agreement available to Baykeeper within five (5) business days of Baykeeper's written request for such record.

h. <u>Track-Out</u>: During the term of this Agreement, Granite Rock shall implement appropriate additional BMPs to reduce or prevent visible track-out of pollutants from each Facility by vehicle traffic, to the extent that other actions required by this Agreement are insufficient to reduce or prevent such visible track-out. On Blomquist Street and Seaport Boulevard in Redwood City, and on Berryessa

5

Road in San Jose, Granite Rock shall sweep at least one hundred (100) feet in the direction of traffic at each of the entrances and exits of the Facilities on a daily basis. Granite Rock shall also sweep at least two hundred (200) feet in the direction of traffic at each of the entrances and exits of the Facilities on a weekly basis. Granite Rock shall sweep at least ten (10) feet in the opposite direction of traffic at the entrances of each of the Facilities on a daily basis. The obligation to sweep shall be excused during rain events, when a Facility is not operating, or in the event of equipment failure or operator incapacitation.

      i.      <u>Paving and Pavement Repair</u>: After the Effective Date, Granite Rock shall repair cracking or replace cracks in asphalt or concrete BMPs (*e.g.,* berms) and shall routinely inspect paved areas and implement additional repairs or replacement of pavement as needed to help reduce constituents in storm water that may be discharged.

      j.      <u>Hazardous Waste Materials Segregation and Handling</u>: During the term of this Agreement, Granite Rock shall continue storing all hazardous waste materials under cover and on an impermeable surface and out of potential contact with storm water that is likely to be discharged, except satellite accumulation stations, which may be located on a permeable surface so long as they are not located near a drop inlet or storm drain. The requirement that hazardous waste materials be stored "under cover" may be satisfied by storage in a covered drum or covered container.

6

k. <u>Inutile Equipment and Parts Storage</u>: Within 180 calendar days of the Effective Date of this Agreement, Granite Rock shall conduct an inspection of its Facilities, including their respective boneyards, and shall identify and remove inutile equipment that may serve as a source for pollutant loading.

l. <u>Vehicle and Equipment Management</u>: Within thirty (30) calendar days of the Effective Date, Granite Rock shall implement any BMPs needed to reduce or minimize pollutant release from equipment such as forklifts, hydraulic lifts, and other heavy equipment that are parked or stored in areas of the Facilities from which storm water discharges. Such BMPs shall include placing drip pans under stored or parked equipment as needed, weekly inspections for evidence of leaks from such equipment, and promptly cleaning up spills, drips, or leaks from such equipment.

m. <u>Vehicle and Equipment Maintenance</u>: During the term of this Agreement, Granite Rock shall continue to refrain from conducting maintenance or repairs on vehicles or other mobile equipment in outdoor, uncovered areas from which storm water discharges from each Facility during rainfall events. Whenever Granite Rock conducts such maintenance or repair activities in non-covered areas from which storm water discharges from each Facility, Granite Rock shall inspect the area where the maintenance or repair occurred and clean-up waste products, including pollutant containing fluids, deposited or spilled on the ground as a result of the maintenance or repair. For purposes of this Paragraph, rainfall events shall not include precipitation slight enough not to produce storm water runoff at a given Facility.

7

n.    Maintenance of BMP Structural Controls:  After the Effective Date, Granite Rock shall maintain structural BMPs at the site in good operating condition during the Wet Season (October 1 to May 31) and shall promptly repair any damaged or degraded structural BMPs.

o.    After the Effective Date, Granite Rock shall add an additional, parallel, adjacent row of rock plates at the entrance to the 195 Seaport Boulevard Facility. Granite Rock shall maintain and clean the rock plates by sweeping them daily, except during rain events, when the Facility is not operating, or in the event of equipment failure or operator incapacitation.

p.    Dust Suppression: During the term of this Agreement, Granite Rock shall continue to implement the dust suppression system at the 195 Seaport Boulevard Facility, which is described in Exhibit D to this Agreement.

q.    Fueling Activities:  After the Effective Date, except in unusual and unexpected circumstances where equipment located on a pervious surface has run out of fuel and requires refueling to be operational, Granite Rock shall conduct fueling activities only on an impervious surface, in accordance with the SWPPP, and shall require that its fuel supplier or employees immediately remove and dispose of any fuel spills in accordance with all applicable local, state, and federal laws and regulations.

r.    Training:  After the Effective Date, and annually thereafter, and within thirty (30) calendar days of hiring of new employees, Granite Rock shall conduct

8

training for all appropriate employees to explain the BMP requirements of this Agreement, the Facility SWPPP, and the General Permit to the extent applicable to such employee. Training shall focus on the employee's role in implementing various environmental measures including, for example, implementation of BMPs or sweeping. If an employee is not reasonably able to comprehend training in English, training shall be conducted in the appropriate language.

8. Amendment of SWPPP and Site Map: Within thirty (30) calendar days of the Effective Date, Granite Rock shall amend each Facility's SWPPP to incorporate the BMPs set forth in this Agreement, and shall amend each Facility's Site Map, if necessary, to include all map components required by this Agreement. Granite Rock shall send a copy of such amended SWPPP to Baykeeper within fourteen (14) calendar days thereafter. Baykeeper shall have thirty (30) calendar days from receipt of the amended SWPPP for either Facility to propose any changes to that SWPPP and to provide the rationale for such proposed changes. Within thirty (30) calendar days of such notification by Baykeeper, Granite Rock shall either adopt such proposed changes or supply Baykeeper with a written explanation for rejecting such proposed changes. The SWPPP for each Facility, as amended in accordance with this provision, shall be deemed compliant with this Agreement and the Clean Water Act unless Baykeeper invokes the Dispute Resolution process set forth in Paragraph 24 within thirty (30) calendar days of receiving Granite Rock's rejection of its proposed changes; the SWPPP shall be deemed compliant with this Agreement while any such Dispute Resolution is pending, and shall be deemed compliant until any such Dispute Resolution is finally resolved to the contrary.

9

## II. SAMPLING, MONITORING, INSPECTION & REPORTING

9. <u>Sampling Program</u>: After the Effective Date, Granite Rock shall collect samples from each Designated Discharge Point at the Facilities according to the following sampling schedule:

    a.    During the Wet Season for 2007-2008 ("First Year"), and except as set forth herein, Granite Rock shall collect four (4) storm water samples from discharges during qualifying storm events, as that term is defined in the General Permit, from each Designated Discharge Point at each of the Facilities. If three (3) consecutive samples from a Designated Discharge Point during qualifying storms have constituent concentrations below the Goals and Benchmark levels set forth in Exhibit E for all parameters sampled, Granite Rock need not conduct additional sampling during the First Year. In the event that four (4) qualifying storm events have not been sampled by Granite Rock prior to February 1st, Granite Rock may collect samples from discharges during storm events that otherwise would not be considered qualifying storm events under the General Permit provided that the sample is not taken on a day which has been preceded by three (3) consecutive days of discharge.

    b.    During the Wet Season for 2008-2009 ("Second Year"), and except as set forth herein, Granite Rock shall collect four (4) storm water samples from discharges during qualifying storm events, as that term is defined in the General Permit, from each Designated Discharge Point at each of the Facilities. If three (3) consecutive samples from a Designated Discharge Point during qualifying storms have constituent

10

concentrations below the Goals and Benchmark levels set forth in Exhibit E for all parameters sampled, Granite Rock need not conduct additional sampling during the Second Year. In the event that four (4) qualifying storm events have not been sampled by Granite Rock prior to February 1st, Granite Rock may collect samples from discharges during storm events that otherwise would not be considered qualifying storm events under the General Permit provided that the sample is not taken on a day which has been preceded by three (3) consecutive days of discharge.

c.     During the Wet Season for 2009-2010 ("Third Year"), and except as set forth herein, Granite Rock shall collect three (3) storm water samples from discharges during qualifying storm events, as that term is defined in the General Permit, from each of the Designated Discharge Points at each of the Facilities. In the event that three (3) qualifying storm events have not been sampled by Granite Rock prior to February 1st, Granite Rock may collect samples from discharges during storm events that otherwise would not be considered qualifying storm events under the General Permit provided that the sample is not taken on a day which has been preceded by three (3) consecutive days of discharge.

d.     Granite Rock shall analyze each storm water sample collected for each of the parameters listed on the Sampling Chart attached hereto as Exhibit E. Should operations materially change from existing operations at any of the Facilities, Granite Rock shall conduct sampling for any additional toxic priority pollutants listed in 40

11

C.F.R. § 131.38 likely to be present in Granite Rock's storm water discharges as a result of the changed operations.

10.     During the Term of this Agreement, except as otherwise provided in Paragraph 9, Granite Rock shall collect all storm water samples within the first hour that discharge is observed during scheduled facility operating hours at the Designated Discharge Points for each qualifying storm event, and shall not engage in sampling events unless the events are at least 24 hours apart and preceded by at least three (3) consecutive days without storm water discharge. All storm water samples collected by Granite Rock pursuant to this Agreement must be delivered to a California state certified environmental laboratory for analysis within the time needed for analysis within laboratory method allowable hold times. The laboratory shall thereafter conduct analysis sufficient to detect individual constituents at or below the levels set forth in Exhibit E.

11.     Sampling Results: Granite Rock shall provide sampling results from Granite Rock's sampling and analysis to Baykeeper within five (5) business days of receiving them. Within thirty (30) calendar days of receiving sampling results, Granite Rock will provide a description of any steps Granite Rock has taken or will take to address any exceedances of the Benchmark values set forth in Exhibit E for TSS, Oil & Grease, and pH. By August 15th of each year during the term of the Agreement, Granite Rock shall provide in the Action Plan described in Paragraph 12 of this Agreement a chart in digital or hardcopy form that summarizes the results of all the samples and includes the levels set forth in Exhibit E for comparison.

12.     Action Plan: By August 15th of each year during the term of this Agreement, Granite Rock shall prepare an Action Plan to analyze the efficacy of existing BMPs, to reduce

12

pollutant concentrations in storm water to Benchmark values set forth in Exhibit E to this

Agreement, and to continue reducing pollutant concentrations in storm water towards the Goals

set forth in Exhibit E to this Agreement, taking into account the factors set forth in Paragraphs 13

and 14 of this Agreement. The Parties disagree as to the legal effect of the Benchmark values

and Goals set forth in Exhibit E, and nothing in this Agreement shall be deemed an admission or

waiver by Granite Rock of the import of those Benchmark values and Goals. However, the

Parties agree to use the Benchmark values and Goals in Exhibit E solely for the purposes of

certain specified activities and obligations of this Agreement.

    13.    <u>Contents of Action Plan</u>: Each Action Plan will set forth:

(a)    The annual mean constituent concentrations from each Designated
Discharge Point for samples collected at each Facility;

(b)    The possible sources of pollutants present in discharged storm water;

(c)    BMPs that Granite Rock evaluated to attempt to reduce the level of
pollutants present in discharged storm water;

(d)    Evaluations of such BMPs;

(e)    Recommended BMPs, if any, resulting from such evaluation, and

(f)    a reasonable schedule to implement the recommended BMPs, with special
attention towards implementing the recommended BMPs prior to the rainy
season or next likely discharge event, if practicable; and

(g)    If Granite Rock recommends a "No Action" alternative, its reasons for so
recommending.

In analyzing recommended BMPs, the Action Plan may consider the expected storm water

pollutant reduction benefits of the recommended BMPs, the costs of the recommended BMPs,

the public agency approvals and permits needed to implement the recommended BMPs, the time

reasonably needed to implement the recommended BMPs, the anticipated implementation date

for the recommended BMPs, the anticipated water quality benefit of the recommended BMPs,

and any factors specified in CWA section 304(b) for determining whether the measures

13

constitute the best available control technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").

14.     To the extent appropriate and not already implemented or considered, Granite Rock shall consider appropriate BMPs as part of the Action Plan process set forth in Paragraph 13, including, but not limited to, the following:

    a.     Hydraulic Controls:  in appropriate paved portions of the Facilities, installation of berms or equivalent structural controls;

    b.     Additional On-Site Retention:  determine whether additional on-site retention of storm water is feasible;

    c.     Increased or Enhanced Sweeping:  More frequent sweeping, the use of regenerative sweepers, high efficiency vacuum assisted dry sweepers, or alternate sweeping-vacuum, as Granite Rock deems appropriate;

    d.     Visual "Track Off" to public streets:  Further BMPs necessary to reduce or prevent visual "track off" of material from the Facility onto public streets;

    e.     Paving: paving appropriate portions of unpaved portions of the Facility from which storm water discharges from the Facility;

    f.     Retention/Detention:  Constructing and operating additional retention or detention ponds, tanks and/or perimeter trench in areas from which storm water discharges from the Facility;

14

g.      Installing alternative treatment and/or storm water conveyance systems that would provide more effective treatment of storm water prior to discharge than currently installed systems such as a fixed bed (media-sand) filter system;

h.      Installing a piping system to convey storm water to the local publicly owned treatment works sanitary sewage collection system and discharging some or all storm water that currently discharges from the Facilities to this collection system;

i.      Identifying and segregating pollutant generating materials from areas which discharge storm water from the Facilities to areas where they can be covered and/or isolated from rainfall and storm water flow, and/or to areas where storm water can be routed to the sanitary sewer or effectively filtered and/or otherwise treated on-site prior to discharge from the Facility, and/or to areas from which storm water does not discharge from the Facility.

Baykeeper shall have thirty (30) calendar days from receipt to propose revisions to the Action Plan and explain in writing the basis for each such revision. Within forty-five (45) calendar days of receiving Baykeeper's revised Action Plan, Granite Rock shall either accept each such revision to the Action Plan or explain in writing why it is rejecting any such revisions.

15.      Any party may thereafter seek Dispute Resolution in accord with Paragraph 24 of this Agreement if the parties remain in dispute over any BMP recommended in any Action Plan. The Action Plan shall be deemed compliant with this Agreement and the Clean Water Act unless Baykeeper invokes Dispute Resolution, and shall be deemed compliant while any Dispute Resolution is pending and until such Dispute Resolution is finally resolved to the contrary. In

15

the event Baykeeper invokes Dispute Resolution to contest an Action Plan, and Baykeeper

prevails at the conclusion of the Dispute Resolution process, Granite Rock shall pay a stipulated

payment of $5,000.00. Payment shall be paid by Granite Rock via overnight mail to: Rose

Foundation, 6008 College Avenue, Oakland, CA 94618, Attn: Tim Little. The funds will be

used by the Rose Foundation to fund projects agreed upon by the Parties that benefit water

quality in the South San Francisco Bay watershed, and will follow the process specified in

Paragraph 21 below. The Parties agree that preparation and implementation of an Action Plan by

Granite Rock shall not mean that Granite Rock has failed to comply with any obligations under

the General Permit. After the parties reach agreement on the BMP recommendations, or after

Dispute Resolution resolves any dispute concerning such BMP recommendations, Granite Rock

shall implement the Action Plan.

16.     Within thirty (30) calendar days after the parties reach agreement or Dispute

Resolution proceedings conclude on the BMP Recommendations, Granite Rock shall amend its

SWPPP to include all BMP Recommendations not otherwise implemented and included in the

SWPPP. Within thirty (30) calendar days thereafter, Granite Rock shall provide Baykeeper with

a copy of such revised SWPPP.

17.     Stipulated Payments: Granite Rock shall pay the following stipulated payments

during the term of this Agreement:

a.     Reporting: In the event Granite Rock submits a late report to Baykeeper

covered herein:

i.     Reports covered by this section include reports required by

16

Paragraphs 8 (Amendment of SWPPP and Site Map incorporating agreed to BMPs), 11 (Sampling Results), 12 - 14 (Action Plan), and 16 (SWPPP amendments reflecting inclusion of new BMPs), as well as Annual Reports submitted to the Regional Water Quality Control Board ("Regional Board") or the State Water Resources Control Board ("State Board") referenced in Paragraph 20.

ii.     For any report more than ten (10) business days late, Granite Rock shall pay a per day payment of $500.00, commencing on the eleventh (11) business day after the report due date.

b.     BMPs: Baykeeper will notify Granite Rock if Baykeeper believes that Granite Rock failed to implement recommended BMPs included in a final Action Plan pursuant to Paragraphs 12 - 15. Granite Rock will have thirty (30) calendar days after receipt of Baykeeper's written notification to cure any such failure, if any such failure exists. Granite Rock will notify Baykeeper in writing of actions taken to cure any such failure, or provide Baykeeper with an explanation as to why no failure exists. If Granite Rock does not cure the alleged failure within thirty (30) calendar days after Baykeeper's notice under this paragraph, or take steps to cure should implementing the cure require longer than thirty (30) calendar days to implement due to materials availability, construction constraints, or related reasons, Granite Rock shall accrue a $5,000 payment on the thiry-first (31st) day after Baykeeper's notice, and a $15,000 payment on the ninety-first (91st) day after Baykeeper's notice. Either party may request a meet and confer or invoke the Dispute Resolution process set forth in Paragraph 24 in relation to any alleged failure to implement or cure or the accrual of any stipulated payments. Granite Rock shall pay any stipulated payments due pursuant to this section within thirty (30) days of conclusion of any meet and confer or dispute resolution process resulting in the payment of stipulated payments.

17

897348.1

c.    Benchmark Values in Exhibit E:  For each sampling result from the sampling required by Paragraph 9 of this Agreement, from each discharge point at each Facility, Granite Rock shall pay a stipulated payment of $500.00 for each sampling result that exceeds the Benchmark values in Exhibit E for TSS, Oil & Grease, and pH.

d.    All payments of accrued stipulated payments described above shall be paid annually by Granite Rock no later than December 31st of each year, via overnight mail to: Rose Foundation, 6008 College Avenue, Oakland, CA 94618, Attn: Tim Little.  Stipulated payment funds will be used by the Rose Foundation to fund projects agreed upon by the Parties that benefit water quality in the South San Francisco Bay watershed, and will follow the process specified in Paragraph 21 below if the amount of annual stipulated payments is more than $3,000. If the amount of annual stipulated payments is less than $3,000, the stipulated payment funds can be used by the Rose Foundation for any projects that benefit water quality in the South San Francisco Bay watershed, without the need for the parties to agree upon such projects.

18.    Site Access:  Baykeeper may have access to portions of the Redwood City or San Jose Facilities from which storm water discharges to inspect compliance with the Agreement during operating hours with two business days advance notice.  Advanced notice may be provided via email.  Granite Rock shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations.  In such case, Granite Rock shall specify at least three (3) business days within the next four (4) calendar weeks upon which a Baykeeper inspection may proceed, with twenty-four (24) hours notice, during normal business hours.  Granite Rock shall not use the period of Baykeeper advance notice pursuant to this Paragraph to make any alterations to Facility

18

conditions that Granite Rock would not otherwise have made but for receiving advance notice of Baykeeper's requested site access.

19. <u>Facility Monitoring:</u> Within thirty (30) calendar days after the Effective Date, Granite Rock shall conduct inspections of those portions of the Facilities from which storm water discharges on days that the Facilities are operating. Such inspections shall occur weekly during the Wet Season, and as close to forecasted storm events that are likely to result in discharge from the Facility as is practicable. Such inspections shall include driveways, outdoor equipment storage areas, storage areas, hazardous material areas, and all process areas. All Designated Discharge Locations shall also be inspected for accumulation of dust, sediment, sand, grit, oily substances, oily sheens upon any standing water, and other materials associated with operations at the Facilities.

20. <u>Reports:</u> During the term of this Agreement, Granite Rock shall provide Baykeeper with a copy of all documents pertaining to the General Permit submitted to the Regional Board or the State Board concerning the Facilities, including all documents and reports submitted to the Regional Board as required by the General Permit. Such documents and reports shall be transmitted to Baykeeper via U.S. or electronic mail at the time the documents are submitted to the Regional or State Board.

### III.  MITIGATION, FEES, AND COSTS

21. <u>Environmental Mitigation Funding</u>: As mitigation of the violations alleged in Baykeeper's 60-Day Notice and Complaint, Granite Rock shall tender payment to the Rose Foundation the sum of seventy thousand dollars ($70,000) within ten (10) calendar days of the

19

expiration of the Department of Justice's 45-day review period as provided in Paragraph 26 of this Agreement. The funds will be used by the Rose Foundation to fund projects agreed upon by the Parties that benefit the South San Francisco Bay watershed. After the Rose Foundation issues a request for proposals/projects for projects that specifically benefit water quality in the South San Francisco Bay watershed, the Rose Foundation will provide the Parties with a list of proposals/projects received by the Rose Foundation. Within thirty (30) calendar days of receiving the list of proposals/projects from the Rose Foundation, the Parties will meet and confer to discuss the proposals/projects, and agree upon the proposals/projects that will be funded with the monies payable pursuant to this Paragraph.

22. <u>Reimbursement of Fees and Costs</u>: Granite Rock shall reimburse Baykeeper in the amount of seventy-three thousand dollars ($73,000) for Baykeeper's reasonable investigation, expert, and attorneys' fees and costs, and all other reasonable costs incurred as a result of investigating the activities at the Facilities related to this Agreement, bringing these matters to Granite Rock's attention, and negotiating a resolution. Granite Rock shall tender payment to Environmental Advocates Attorney-Client Trust Account within ten (10) calendar days of the expiration of the Department of Justice's 45-day review period as provided in Paragraph 26 of this Agreement.

23. <u>Oversight Monitoring Costs</u>: Granite Rock shall reimburse Baykeeper in the amount of twelve thousand dollars ($12,000) for Baykeeper's expert and attorneys' fees and costs spent reviewing Granite Rock's compliance with ongoing obligations under this Agreement. Granite Rock shall tender payment to Environmental Advocates Attorney-Client

20

Trust Account within ten (10) calendar days of the expiration of the Department of Justice's 45-day review period as provided in Paragraph 26 of this Agreement.

24. <u>Dispute Resolution</u>: If a dispute arises under this Agreement, or if either Party believes that a breach of this Agreement has occurred, the Parties shall, within ten (10) business days of receiving written notification from the other Party of a request for a meeting, schedule a meet and confer to determine whether a violation has occurred and to develop a mutually agreed upon plan to resolve the dispute. If the Parties fail to meet and confer or the meet and confer does not resolve the issue, either Party shall be entitled to all rights and remedies under the law, including bringing a motion before the United States District Court for the Northern District of California which shall retain jurisdiction over the Action for the limited purposes of administration of this Agreement. No such action or motion shall be filed until after at least ten (10) business days have passed after the meet and confer occurred or was refused. The parties shall be entitled to seek fees and costs incurred in any such action and such fees and costs shall be awarded, pursuant to the provisions set forth in the Section 505(d) of the Clean Water Act, 33 U.S.C. §1365(d), and applicable case law interpreting such provision.

## IV.   FEDERAL AGENCY REVIEW PERIOD/STIPULATION TO DISMISS

25. For the purposes of this Agreement, the Parties stipulate that the United States District Court of California has jurisdiction over the Parties and subject matter of this Action. The Parties stipulate that venue is appropriate in the Northern District of California and that Baykeeper has standing to bring this action.

21

897348.1

26. <u>Submission of Settlement Agreement to DOJ.</u>  Within three (3) business days of receiving all of the Parties' signatures to this Agreement, Baykeeper shall submit this Agreement to the U.S. Department of Justice ("DOJ") for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) calendar days after receipt by the DOJ, evidenced by the certified return receipt, a copy of which shall be provided to Granite Rock upon receipt by Baykeeper.  In the event DOJ comments negatively on the provisions of this Agreement, the Parties agree to meet and confer to attempt to resolve the issue(s) raised by DOJ.

27. <u>Stipulation to Dismiss With Prejudice.</u>  Within ten (10) calendar days of the expiration of the Department of Justice's 45-day review period as provided in Paragraph 26 of this Agreement, the Parties will submit this Agreement to the District Court along with a Stipulation and proposed Order which shall provide:

 a. For dismissal of the Complaint and all claims therein with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii); and

 b. That the Court shall retain and have jurisdiction over the Parties with respect to disputes arising under this Agreement.

## V. WAIVER AND RELEASE, AND COVENANT NOT TO SUE

28. <u>Baykeeper Waiver and Release of Noticed Parties and Covenant Not to Sue:</u> Upon the Effective Date of this Agreement, Baykeeper, on its own behalf and on behalf of its officers, directors, employees, members, parents, subsidiaries, affiliates and each of their successors and assigns and its agents, attorneys, and other representatives, covenants not to sue Granite Rock or its officers, directors, employees, members, parents, subsidiaries, affiliates, or their successors or assigns, or its agents, attorneys and other representatives with respect to any

22

storm water discharges that arose before, or may arise during, the Term of this Agreement. Baykeeper, on its own behalf and on behalf of its officers, directors, employees, members, parents, subsidiaries, affiliates and each of their successors and assigns and its agents, attorneys, and other representatives, releases Granite Rock or its officers, directors, employees, members, parents, subsidiaries, affiliates, or their successors or assigns, or its agents, attorneys and other representatives from and waives all claims which arose from or pertain to the Complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Complaint.

29. <u>Granite Rock Waiver and Release of Baykeeper</u>: Granite Rock, on its own behalf and on behalf of its officers, directors, employees, members, parents, subsidiaries, affiliates, or their successors or assigns, or its agents, attorneys and other representatives, releases Baykeeper and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns and its agents, attorneys and other representatives from, and waives all claims which arose from or pertain to the Complaint, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Complaint.

30. <u>No Admission</u>: The Parties enter into this Agreement for the purpose of avoiding prolonged and costly litigation. Nothing in this Agreement shall be construed as any admission as to any fact, finding, issue of law, or violation of law, nor shall compliance with this Agreement constitute or be construed as an admission by Granite Rock of any fact, finding,

23

conclusion, issue of law, or violation of law. However, this Paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Agreement.

31.     The SETTLING PARTIES acknowledge that they are familiar with section 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

The settling parties hereby waive and relinquish any rights or benefits they may have under California Civil Code section 1542 with respect to any other claims against each other arising from, or related to, the allegations and claims as set forth in the 60-Day Notice Letter and/or the Complaint.

## VI.     MISCELLANEOUS PROVISIONS

32.     The term "Effective Date," as used in this Agreement shall mean the last day on which the signature of a Party to this Agreement is executed.

33.     Term of Agreement:  The Agreement shall continue in effect for a period of three (3) years from the Effective Date, and it shall automatically terminate on that date.

34.     Execution in Counterparts:  The Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.

35.     Severability:  If any of the provisions of this Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

36.     Construction:  The language in all parts of this Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning.

24

37.    Authority to Sign:  The undersigned are authorized to execute this Agreement on

behalf of their respective parties and have read, understood and agreed to all of the terms and

conditions of this Agreement.

38.    Integrated Agreement:  All agreements, covenants, representations and

warranties, express or implied, oral or written, of the Parties concerning the subject matter of this

Agreement are contained herein.

39.    Notices:  Any notices or documents required or provided for by this Agreement or

related thereto that are to be provided to Baykeeper pursuant to this Agreement shall be hand

delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, alternatively, may

be provided by electronic mail transmission to the e-mail addresses listed below:

San Francisco Baykeeper
Amy Chastain
785 Market Street, Suite 850
San Francisco, CA 94103
E-mail:  amy@baykeeper.org


With copies sent to:

Jodene Isaacs
Environmental Advocates
5135 Anza Street
San Francisco, California 94121
E-mail:  jisaacs@enviroadvocates.com


Unless otherwise requested by Granite Rock in writing, any notices or documents required or

provided for by this Agreement or related thereto that are to be provided to Granite Rock

pursuant to this Agreement shall be hand delivered or sent by U.S. Mail, postage prepaid, and

25

addressed as follows or, alternatively, may be provided by electronic mail transmission to the e-mail addresses listed below:

Granite Rock:

Tom Squeri, Vice President and General Counsel
Aaron Johnston-Karas, Environmental Services Manager
P.O. Box 50001
Watsonville, CA 95077-5001
Email: tsqueri@Graniterock.com
Email: ajohnstonkaras@Graniterock.com

With copies sent to:

Katharine E. Wagner
Nicole E. Granquist
Downey Brand LLP
555 Capitol Mall, 10th Floor
Sacramento, CA 95814
Email: kwagner@downeybrand.com
Email: ngranquist@downeybrand.com

40. <u>Facsimile Signatures</u>:  The Parties' signatures to this Agreement transmitted by facsimile or electronic mail transmission shall be deemed binding.

41. <u>Impossibility of Performance</u>:  No Party shall be considered to be in default in the performance of any of its obligations under this Agreement when performance becomes impossible, despite the timely good faith efforts of the Party, due to circumstances beyond the Party's control, including without limitation any act of God, war, terror, fire, earthquake, flood, labor unrest, and restraint by court order or public authority.  "Circumstances beyond the Party's control" shall not include normal inclement weather, economic hardship, or inability to pay. Any Party seeking to rely upon this Paragraph shall have the burden of establishing that it could

26

not reasonably have been expected to avoid, and which by exercise of due diligence has been unable to overcome, the impossibility of performance.

42.     Choice of Law: This Agreement shall be governed by the laws of the United States, and where applicable, the laws of the State of California.

43.     Full Settlement: This Agreement constitutes a full and final settlement of this matter. It is expressly understood and agreed that the Agreement has been freely and voluntarily entered into by the Settling Parties with and upon advice of counsel.

44.     Modification of the Agreement: This Agreement, and any provisions herein, may not be changed, waived, discharged or terminated unless by a written instrument, signed by the Settling Parties.

45.     Non-Assignability:  Except as expressly authorized herein, Baykeeper shall not assign any of its rights under this Agreement, except for any right to payment.

46.     If for any reason the Department of Justice or the District Court should decline to approve this Agreement in the form presented, the Parties shall use their best efforts to work together to modify the Agreement so that it is acceptable to the Department of Justice or the District Court. If the Parties are unable to modify this Agreement in a mutually acceptable manner that is acceptable to the Department of Justice, they shall nonetheless seek District Court approval for the Agreement as drafted. If the Parties are unable to modify this Agreement in a mutually acceptable manner that is acceptable to the District Court, however, this Agreement shall immediately be null and void. as well as inadmissible as a settlement communication under

Federal Rule of Evidence 408.

Date: December 21, 2007                    Date: _____, 2007


_____                   _____
by:   DEBORAH SELF                          by:   TOM SQUERI
      Executive Director                          Vice President and General Counsel,
      San Francisco Baykeeper                      Granite Rock Company


Approved as to form:

ENVIRONMENTAL ADVOCATES                     DOWNEY BRAND, LLP

Date: December 21, 2007                     Date: _____, 2007


_____                   _____
by:   JODENE ISAACS             by:         NICOLE E. GRANQUIST
      CHRISTOPHER SPROUL                     Attorney for Granite Rock Company
      Attorneys for San Francisco
      Baykeeper

28

897348.1

Federal Rule of Evidence 408.

Date: _____, 2007          Date: 12/26, 2007


_____        _____
by:   DEBORAH SELF                     by:   TOM SQUERI
      Executive Director                     Vice President and General Counsel,
      San Francisco Baykeeper                 Granite Rock Company

Approved as to form:

ENVIRONMENTAL ADVOCATES                 DOWNEY BRAND, LLP

Date: _____, 2007               Date: Dec. 26, 2007


_____                Nicole Granquist
by:   JODENE ISAACS              by:    _____
      CHRISTOPHER SPROUL                NICOLE E. GRANQUIST
      Attorneys for San Francisco              Attorney for Granite Rock Company
      Baykeeper

28



EXHIBIT A

Graniterock

## Form 4 - **Monthly Storm Water Observations**

**MONTH: OCTOBER 2007**

<table>
<tr><td colspan="2"><u>Helpful Tips :</u><br>• Storm water discharge visual observations are required for <u>at least one storm event per month</u> between October 1 and May 31.<br>• Visual observations must be conducted during the first hour of discharge at all discharge locations.<br>• Discharges of temporarily stored or contained storm water must be observed at the time of discharge. If discharge occurs from secondary containment use Secondary Containment Discharge Report Form</td><td>• Make additional copies of this form as needed.<br>• Record <b>any eligible storm events</b> for this sampling period that do not result in discharge including date, time name, title of team member who observed that there was NO storm water discharge.<br>• Indicate "No discharge" in the first column if no storm event that produced discharge occurred during the month.</td></tr>
</table>

| Discharge Point: **EAST GATE** | Date/Time: | **DISCHARGE?** (CHECK ONE) ☐YES ☐NO <u>QUALIFYING DISCHARGE?</u> (CHECK ONE) ☐YES ☐NO | Floating or Suspended Material? (CHECK ONE) ☐YES ☐NO Describe: Source(s): | Turbidity or Discoloration? (CHECK ONE) ☐YES ☐NO Describe: Source(s): | Odors? (CHECK ONE) ☐YES ☐NO Describe: Source(s): | Oil and Grease Sheen Present? (CHECK ONE) ☐YES ☐NO Describe: Source(s): |
|---|---|---|---|---|---|---|
| **COMMENTS/ ACTION TAKEN:** | | | | | | |
| Discharge Point: **WEST GATE** | Date/Time: | **DISCHARGE?** (CHECK ONE) ☐YES ☐NO <u>QUALIFYING DISCHARGE?</u> (CHECK ONE) ☐YES ☐NO | Floating or Suspended Material? (CHECK ONE) ☐YES ☐NO Describe: Source(s): | Turbidity or Discoloration? (CHECK ONE) ☐YES ☐NO Describe: Source(s): | Odors? (CHECK ONE) ☐YES ☐NO Describe: Source(s): | Oil and Grease Sheen Present? (CHECK ONE) ☐YES ☐NO Describe: Source(s): |
| **COMMENTS/ ACTION TAKEN:** | | | | | | |

Branch: _211_                      Date: _____

Inspector Name:_____        Signature:_____ **Page 1 of 2**

**Form 4 - Monthly Observations: Clarifier Drain Inlet Inspections**

**MONTH: OCTOBER 2007**

<u>**Helpful Tips :**</u>
- Conduct visual observation of drain inlet to <u>clarifier once per month</u>
- Describe the general condition of the drain inlet, noting any accumulation of dirt or debris, any rips or tears in the filter, etc.
- Provide the maximum detail possible, including what was done and when it was done.

| Clarifier Drain Inlet: Rail **Road** **Tracks** | Date/Time: | **General condition of drain inlet:** | Accumulation of dirt or debris? (CHECK ONE) ☐YES ☐NO | Corrective action needed? (CHECK ONE) ☐ YES ☐ NO | BMP need repair/replacement (i.e. tears in filters, etc)? ☐YES ☐NO | Corrective action needed? (CHECK ONE) ☐YES ☐NO |
|---|---|---|---|---|---|---|
| | | | Describe: | Describe: Date of implementation: | Describe: | Describe: Date of implementation |
| NOTES/ ACTION TAKEN: Provide the maximum detail possible, including what was done and when it was done. | | | | | | |

| Clarifier Drain Inlet: **Batch** **Plant** | Date/Time: | **General condition of drain inlet:** | Accumulation of dirt or debris? (CHECK ONE) ☐YES ☐NO | Corrective action implemented? (CHECK ONE) ☐ YES ☐ NO | BMP need repair/replacement (i.e. tears in filters, etc)? ☐YES ☐NO | Corrective action implemented? (CHECK ONE) ☐YES ☐NO |
|---|---|---|---|---|---|---|
| | | | Describe: | Describe: Date of implementation: | Describe: | Describe: Date of implementation |
| NOTES/ ACTION TAKEN: Provide the maximum detail possible, including what was done and when it was done. | | | | | | |

Branch: __211 (365 Blomquist)__          Date: _____

Inspector Name:_____     Signature:_____ **Page 2 of 2**



## Exhibit B

Sweeping Plan for 365 Blomquist Street, Redwood City, CA

### Sweeping Frequency

- Sweep exposed, accessible paved surfaces during the rainy season at least one time each day of operation. The rainy season is defined as October 1st through May 31st. Operation does not include plant maintenance activities, administrative activities, indoor vehicle maintenance activities, or activities that occur in areas that do not have off-site storm water runoff actions or do not discharge (e.g., emulsion manufacturing activities in contained areas).
- Sweep exposed, accessible paved surfaces during the non-rainy season at least two times each week during days of operation. Operation does not include plant maintenance activities, administrative activities, indoor vehicle maintenance activities, or activities that occur in areas that do not have off-site storm water runoff actions or do not discharge (e.g., emulsion manufacturing activities in contained areas).
- Log sweeping activities immediately after they are completed.
- Do not sweep when raining or if the surface is wet from residual rains.

### Equipment

- The primary sweeping shall be accomplished by an industrial sweeper, such as a mechanical brush type.
- Secondary sweeping will be completed by an industrial sweeper, such as a mechanical assist true vacuum sweeper (i.e. Tennant 830-II).
- Where necessary, Manual Sweeping may be done by hand sweeping or hand shoveling (e.g. under plant, around bag house).



**Graniterock.**

MATERIAL SUPPLIER / ENGINEERING CONTRACTOR · LICENSE #22

## Sweeping Plan for 11711 Berryessa St., San Jose, CA

### Sweeping Frequency

- Sweep exposed, accessible paved surfaces during the rainy season at least one time each day of operation. The rainy season is defined as October 1st through May 31st. Operation does not include plant maintenance activities, administrative activities, indoor vehicle maintenance activities, or activities that occur in areas that do not have off-site storm water runoff actions or do not discharge (e.g., emulsion manufacturing activities in contained areas).

- Sweep exposed, accessible paved surfaces during the non-rainy season at least two times each week during days of operation. Operation does not include plant maintenance activities, administrative activities, indoor vehicle maintenance activities, or activities that occur in areas that do not have off-site storm water runoff actions or do not discharge (e.g., emulsion manufacturing activities in contained areas).

- Log sweeping activities immediately after they are completed.

- Do not sweep when raining or if the surface is wet from residual rains.

### Equipment

- The primary sweeping will be completed by an industrial sweeper, such as a mechanical assist true vacuum sweeper (i.e. Tennant Centurion).

- Where necessary, manual sweeping may be done by hand sweeping or hand shoveling (e.g. under plant or behind shop).

- Where necessary, mobile equipment (i.e. a loader) will be used to scrape accumulated material from paved surfaces (i.e. under plant).



**Graniterock**

MATERIAL SUPPLIER / ENGINEERING CONTRACTOR · **LICENSE #22**

# Sweeping Plan for 355 Blomquist St., Redwood City, CA

## Sweeping Frequency

- Sweep exposed, accessible paved surfaces during the rainy season at least one time each day of operation. The rainy season is defined as October 1st through May 31st. Operation does not include plant maintenance activities, administrative activities, indoor vehicle maintenance activities, or activities that occur in areas that do not have off-site storm water runoff actions or do not discharge (e.g., emulsion manufacturing activities in contained areas).

- Sweep exposed, accessible paved surfaces during the non-rainy season at least two times each week during days of operation. Operation does not include plant maintenance activities, administrative activities, indoor vehicle maintenance activities, or activities that occur in areas that do not have off-site storm water runoff actions or do not discharge (e.g., emulsion manufacturing activities in contained areas).

- Log sweeping activities immediately after they are completed.

- Do not sweep when raining or if the surface is wet from residual rains.

## Equipment

- Primary sweeping will be completed by an industrial sweeper, such as a mechanical assist true vacuum sweeper (i.e. Tennant 830-II).

- Where necessary, manual sweeping may be done by hand sweeping or hand shoveling (e.g. under plant, behind shop).

- Where necessary, mobile equipment (i.e. a loader) will be used to scrape accumulated material from paved surfaces (e.g. near recycled water ponds).



**Graniterock**
MATERIAL SUPPLIER / ENGINEERING CONTRACTOR • LICENSE #22

## Sweeping Plan for 195 Seaport Blvd., Redwood City, CA

### **Sweeping Frequency**

- Sweep exposed, accessible paved surfaces during the rainy season at least one time each day of operation. The rainy season is defined as October 1st through May 31st. Operation does not include plant maintenance activities, administrative activities, indoor vehicle maintenance activities, or activities that occur in areas that do not have off-site storm water runoff actions or do not discharge (e.g., activities in contained areas).

- Sweep exposed, accessible paved surfaces during the non-rainy season at least two times each week during days of operation. Operation does not include plant maintenance activities, administrative activities, indoor vehicle maintenance activities, or activities that occur in areas that do not have off-site storm water runoff actions or do not discharge (e.g., activities in contained areas).

- Log sweeping activities immediately after they are completed.

- Do not sweep when raining or if the surface is wet from residual rains.

### **Equipment**

- Primary sweeping will be completed by an industrial sweeper, such as a mechanical assist true vacuum sweeper (e.g. Tennant 830-II).

- Where necessary, mobile equipment (e.g. a bobcat) will be used to scrape accumulated material from paved surfaces (e.g. in front of entry gate).

# EXHIBIT C

## GRANITE ROCK COMPANY SWEEPING LOG

This log is to be kept in the Sweeper at all times and must be filled out with **maximum** detail each time the Sweeper is operated.

195 SEAPORT BLVD, REDWOOD CITY, CA

| Date | Initials | Area of Facility Swept | Notes |
|------|----------|------------------------|-------|
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |

This log is to be kept in the Sweeper at all times and must be filled out with <u>maximum</u> detail each time the Sweeper is operated.

# GRANITE ROCK COMPANY SWEEPING LOG

355 BLOMQUIST ST., REDWOOD CITY, CA

| Date | Initials | Area of Facility Swept | Notes |
|------|----------|------------------------|-------|
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |

S64198.1

This log is to be kept in the Sweeper at all times and must be filled out with <u>maximum</u> detail each time the Sweeper is operated.

# GRANITE ROCK COMPANY SWEEPING LOG

365 BLOMQUIST ST., REDWOOD CITY, CA

| Date | Initials | Area of Facility Swept | Notes |
|------|----------|------------------------|-------|
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |

864198.1

This log is to be kept in the Sweeper at all times and must be filled out with <u>maximum</u> detail each time the Sweeper is operated.

# GRANITE ROCK COMPANY SWEEPING LOG

11711 BERRYESSA RD., SAN JOSE, CA

| Date | Initials | Area of Facility Swept | Notes |
|------|----------|------------------------|-------|
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |
|      |          |                        |       |

**Exhibit D:**
**Dust Suppression and Management System**
**Redwood City Recycling Facility**

Purpose:      The purpose of the Dust Suppression and Management System is to reduce visible airborne dust at the facility and prevent offsite deposition of dust and particulate. The system is operated in a manner to effectuate these purposes.

Training:      Specified personnel (as defined below) are trained in Visible Emissions Evaluations (VEE), a California Air Resources Board training course commonly known as "Smoke School." VEE is a three-day course in air pollution emphasizing evaluation of visible emissions, including particulate matter and dust. The program also trains participants to perform EPA Method 9 for reading visible emissions. *See* Visible Determination of the Opacity of Emissions From Stationary Sources, 40 C.F.R. Part 60, App. A, Method 9, available at http://www.epa.gov/ttn/emc/promgate/m-09.pdf. Additional course topics include air pollution and its effects, meteorology, water vapor plumes, air pollution law, inspection procedures, and diesel smoke enforcement.

Personnel:      Both the loader operator and the plant operator have received VEE training. At least one VEE-trained employee is present during operation to observe emissions and to instruct and supervise other employees in dust control. All other production employees are cross-trained in dust suppression by the VEE-trained personnel.

Equipment:      Moisture content is controlled at the raw feed (*i.e.,* the pile(s) of broken pieces of concrete and asphalt) by an auxiliary portable sprinkler system. The material is fed from the raw feed to the receiving hopper, which transports the material to the plant.

     At the receiving hopper, dust is suppressed by spray nozzles attached to the hopper. These sprays are part of the plant's NESCO system designed by Dr. Mark Kestner. A high pressure water spray system (150 to 200 psi) applies water through specialized sprays, which are specifically designed for this plants transfer points. The nozzles "atomize" the water for effective dust control, and are managed to prevent the presence of excess water.

Operations:      The dust suppression system is a dynamic process, and it is critical that trained operators have flexibility so that they can adapt to climatic and operational fluxes.

     The auxiliary portable sprinkler system is used to control moisture content at the raw feed, when necessary. During most of the year, climatic

conditions (including relative humidity, precipitation, and evaporation) are typically such that the auxiliary system is not necessary. The loader operator monitors the raw feed for dust and reacts accordingly. If the loader operator detects visible dust, the loader operator responds using training, experience, and judgment to determine how best to use the auxiliary system. The loader operator may also use the auxiliary system on parts of the raw feed the day before the raw feed will be transferred to the plant. This action suppresses dust from the transfer of material from the raw feed to the plant's receiving hopper.

The plant operator monitors the receiving hopper for dust, using training, experience, and judgment. If the plant operator or the loader operator detects dust at the receiving hopper, the first response is for the loader operator to dig into wetter material or to use the raw feed's auxiliary system to wet the feed. The receiving hopper is also equipped with spray nozzles, which the plant operator may operate manually, when necessary.

The plant's NESCO dust control system operates automatically. It is activated when the plant operates, but may be deactivated during rain. The nozzles, which are specifically designed for this plant's transfer points, "atomize" water. Water sprays are monitored and then cleaned, repaired, and replaced as needed.

# EXHIBIT E
## Goals for Granite Rock Redwood City and San Jose Facilities

| Constituent | Goals[1] | Reference | (EPA Benchmark Values)[2] | EPA Analysis Method or Minimum Detection Limit |
|---|---|---|---|---|
| **Total Suspended Solids** | 100 mg/L | *EPA Storm Water Benchmark* | 100 mg/L | Method 160.2 |
| **Oil and Grease** | 15 mg/L | *EPA Storm Water Benchmark* | 15 mg/L | Method 1664 |
| **Electrical Conductivity** | 900 micromhos | *California Secondary MCL, Recommended Level* | N/A | |
| **pH** | 6.5 to 8.5 | *SF-RWQCB Basin Plan, all surface waters* | 6.0-9.0 | Method 9040b |
| **Aluminum** | | | | |
| *Redwood City* | 0.750 mg/L | *EPA Storm Water Benchmark* | 0.750 mg/L | 0.05 mg/L |
| *San Jose* | 0.750 mg/L | *EPA Storm Water Benchmark* | 0.750 mg/L | 0.05 mg/L |
| **Copper** | | | | |
| *Redwood City* | 0.0031 mg/L | *CTR-Based Criteria: <u>Saltwater</u> Aquatic Life protection CCC (Chronic)* | 0.0636 mg/L | 0.003 mg/L |
| *San Jose* | 0.0093 mg/L | *CTR-Based Criteria: <u>Freshwater</u> Aquatic Life protection CCC (Chronic)[3]* | 0.0636 mg/L | 0.003 mg/L |

[1] Site specific objectives for copper in portions of San Francisco Bay are currently under consideration by the State Water Resources Control Board, as proposed in the Basin Plan amendment adopted by the RWQCB in Resolution R2-2007-0042. The amendment would change the Redwood City goal for copper to 0.006 mg/l. Upon its effective date (i.e. approval by U.S. EPA), any new site specific objective would automatically be incorporated by reference as a goal for this Exhibit E. Any other site specific objectives adopted for any metal listed in the Goals section of Exhibit E would replace and be incorporated by reference as the goal for that constituent, as of the date the site specific objective becomes effective.

[2] 65 F.R. 64746, 64766-64767 (Oct. 30, 2000).

[3] Total recoverable, at hardness 100 mg/L as CaCO3

887639.2

| Constituent | Goals[1] | Reference | (EPA Benchmark Values)[2] | EPA Analysis Method or Minimum Detection Limit |
|---|---|---|---|---|
| **Iron** | | | | |
| *Redwood City* | 1.0 mg/L | *EPA NAWQC- EPA Storm Water Benchmark* | 1.0 mg/L | 0.1 mg/L |
| *San Jose* | 1.0 mg/L | *EPA NAWQC- EPA Storm Water Benchmark* | 1.0 mg/L | 0.1 mg/L |
| **Lead** | | | | |
| *Redwood City* | 0.0081 mg/L | *SF-RWQCB, Table 3.3, Basin Plan, Salt Water Chronic* | 0.816 mg/L | 0.001 mg/L |
| *San Jose* | 0.0032 mg/L | *CTR-Based Criteria: Freshwater Aquatic Life protection CCC (Chronic)[4]* | 0.816 mg/L | 0.001 mg/L |
| **Nickel** | | | | |
| *Redwood City* | 0.0082 mg/L | *SF-RWQCB, Table 3.3, Basin Plan, Salt Water Chronic* | 1417 µg/1 | 0.005 mg/L |
| *San Jose* | 0.052 mg/L | *SF-RWQCB, Table 3.4, Basin Plan, Fresh Water Chronic* | 1417 µg/1 | 0.005 mg/L |
| **Zinc** | | | | |
| *Redwood City* | 0.081 mg/L | *SF-RWQCB, Table 3.3, Basin Plan, Salt Water* | 0.117 mg/L | 0.01 mg/L |
| *San Jose* | 0.120 mg/L | *SF-RWQCB, Table 3.4, Basin Plan, Fresh Water* | 0.117 mg/L | 0.01 mg/L |

[4] Total recoverable, at hardness 100 mg/L as CaCO3

887639.2